UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JERMAINE RUMLEY                                    CIVIL ACTION

VERSUS                                                    NO. 19-9649

WARDEN DARRYL VANNOY                         SECTION: "S"(1)


REPORT AND RECOMMENDATION

Petitioner, Jermaine Rumley, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

Petitioner, Glenn Elliot, Darren K. Holmes, David D. Quinn, and Brian Beasley were all indicted for the crimes of aggravated rape, aggravated kidnapping, and armed robbery. Petitioner and Elliot were then tried together and convicted of all charges.[1] On June 26, 2014, petitioner and Elliot were then sentenced to life imprisonment on the aggravated rape convictions, to life imprisonment on the aggravated kidnapping convictions, and to fifty years imprisonment on the armed robbery convictions. It was ordered that those sentences be served concurrently and without benefit of probation, parole, or suspension of sentence.[2] On December 16, 2015, the Louisiana

---

[1] State Rec., Vol. 10 of 12, trial transcript, p. 627; State Rec., Vol. 3 of 12, minute entry dated May 23, 2014.
[2] State Rec., Vol. 10 of 12, transcript of June 26, 2014; State Rec., Vol. 3 of 12, minute entry dated June 26, 2014. In separate proceedings, the charges against the other co-defendants were resolved as follows: Holmes pleaded guilty to forcible rape, second degree kidnapping, and armed robbery, and he was sentenced on each charge to a concurrent sentence of forty-five years imprisonment; Quinn pleaded guilty to armed robbery and was sentenced to eighteen years imprisonment, and the other two charges against him were *nolle prosequied*; and all charges against Beasley were *nolle prosequied*. See State v. Rumley, 183 So. 3d 640, 646 n.1 (La. App. 4th Cir. 2015); State Rec., Vol. 10 of 12.

Fourth Circuit Court of Appeal affirmed those convictions and sentences.[3]  The Louisiana Supreme Court then denied petitioner's related writ application on January 13, 2017.[4]

On or about March 23, 2017, petitioner sought post-conviction relief in the state district court.[5]  That application was denied on June 20, 2017.[6]  His related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on October 16, 2017,[7] and the Louisiana Supreme Court on December 17, 2018.[8]

On April 18, 2019, petitioner filed the instant federal application seeking habeas corpus relief.[9]  The state filed a response arguing that the application was untimely.[10]  Petitioner filed a reply contending that the state incorrectly calculated the limitations period.[11]

## I.  Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a statute of limitations applicable to federal habeas corpus proceedings.  That statute of limitations generally requires a petitioner to bring his § 2254 claims within one (1) year of the date on which

---

[3] State v. Rumley, 183 So. 3d 640 (La. App. 4th Cir. 2015); State Rec., Vol. 10 of 12.

[4] State v. Rumley, 215 So. 3d 241 (La. 2017); State Rec., Vol. 12 of 12.  Elliot's Louisiana Supreme Court writ application was separately denied on March 24, 2017.  State v. Rumley, 216 So. 3d 812 (La. 2017); State Rec., Vol. 1 of 12.

[5] State Rec., Vol. 1 of 12.  Petitioner alleges that he originally filed his memorandum seeking post-conviction relief with the state district court on or about March 23, 2017, but he inadvertently failed to file a copy of the actual application itself.  However, he corrected that defect in June of 2017.  See State Rec., Vol. 1 of 12, letter from petitioner to the Clerk of the Orleans Parish Criminal District Court dated June 2, 2017.

[6] State Rec., Vol. 1 of 12, Judgment dated June 20, 2017.

[7] State v. Rumley, No. 2017-K-0797 (La. App. 4th Cir. Oct. 16, 2017); State Rec., Vol. 11 of 12.

[8] State ex rel. Rumley v. State, 259 So. 3d 335 (La. 2018); State Rec., Vol. 12 of 12.

[9] Rec. Doc. 1.  Although petitioner's application was not actually received by this Court until April 22, 2019, "[a] prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  That date is not apparent from the record; however, petitioner signed his accompanying memorandum on April 18, 2019.  In the absence of any contrary evidence, the Court will assume that is the date the application was submitted to prison authorities for mailing.

[10] Rec. Doc. 19.

[11] Rec. Doc. 20.

his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[12]  With respect

to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging
> a state conviction begins to run on "the date on which the [state] judgment became
> final by the conclusion of direct review or the expiration of the time for seeking
> such review." 28 U.S.C. § 2244(d)(1)(A).   When a habeas petitioner has pursued
> relief on direct appeal through his state's highest court, his conviction becomes
> final ninety days after the highest court's judgment is entered, upon the expiration
> of time for filing an application for writ of certiorari with the United States Supreme
> Court.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (quotation marks and brackets omitted).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application

on January 13, 2017.  Therefore, his state criminal judgment became final for AEDPA purposes

ninety days later, i.e. on April 13, 2017, when his period expired for seeking review by the United

States Supreme Court.

Nevertheless, in the instant case, the statute of limitations did not in fact begin running on

that date, because petitioner had already tolled the limitations period by filing a post-conviction

application with the state district court on or about March 23, 2017.  See 28 U.S.C. § 2244(d)(2)

("The time during which a properly filed application for State post-conviction or other collateral

review with respect to the pertinent judgment or claim is pending shall not be counted toward any

period of limitation under this subsection.").  Tolling then continued uninterrupted for the duration

of the post-conviction proceedings, so long as he sought supervisory review in a timely manner.

Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004).  Here, the

state does not argue that petitioner's related writ applications were untimely.  Accordingly, the

---

[12] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the
commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

undersigned finds that tolling continued until December 17, 2018, the date on which the Louisiana Supreme Court denied relief.[13]

When the limitations period finally commenced on that date, petitioner had his entire one-year limitations period still available.  Therefore, he had until December 17, 2019, to file his federal habeas corpus application.  Because he filed this application on April 18, 2019, it was timely filed.

## II.  Standards of Review

In addition to establishing the foregoing statute of limitations, the AEDPA also "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, No. 19-6413, 2020 WL 1906607 (U.S. Apr. 20, 2020).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The

---

[13] A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d)

reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); <u>Langley</u>, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

<u>Langley</u>, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." <u>Id.</u> at 170.

> Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>Woodall</u>, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

### III.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts and trial testimony in this case as follows:

**FACTS**

On the afternoon of January 26, 2012, the victim, a licensed practical nurse, was scheduled to visit a hospice patient on Thalia Street. She parked her car in front of the patient's home. While the victim was sitting in her parked car talking on her cellphone, she was suddenly confronted by two masked black males brandishing firearms who commanded her to surrender her money and valuables. One of the black males, later identified to be Darren Holmes, began to rummage through the victim's car. Darren Holmes then got into the vehicle and forced the victim at gunpoint to drive around the neighborhood and park at an abandoned house. Darren Holmes then forced the victim at gunpoint into the abandoned house and proceeded to rape her. David Quinn, along with defendants Glenn Elliott and Jermaine Rumbley [sic], entered the abandoned house after seeing the victim's car parked outside. Glenn Elliott and Jermaine Rumley joined Darren Holmes in raping the victim. When they were finished, the group stole the victim's personal belongings and fled the scene.

….

**SUMMARY OF PERTINENT TESTIMONY ELICITED AT TRIAL**

The victim's supervisor testified that in 2012, the victim was employed at a home health care and hospice service. The witness testified that on January 26, 2012, the day of the rape, the victim was scheduled to visit a patient on Thalia Street. That afternoon she received a telephone call from a private sitter, that occasionally sat with some of their patients, who informed her that she had been on

the telephone with the victim when the incident began. The witness testified that she had personally received a telephone call from the victim approximately three hours later when the victim was at home. Based on what the victim told her had transpired, she advised the victim not to change clothes, bathe, wash, wipe anything, or even go to the bathroom.

The witness arranged to meet the victim at Touro Infirmary, only to be informed that the hospital did not perform forensic rape examinations. The witness said that when she initially saw the victim, she was crying, anxious, disheveled, dirty, and appeared to be in shock and opined that this was atypical behavior for victim. From Touro Infirmary, they went to University Hospital where the victim was examined by a Sexual Assault Nurse Examiner ("SANE"). The witness stayed at the hospital with the victim until 3:00 or 4:00 a.m. and she drove the victim home.

Detective Kevin Williams of the New Orleans Police Department ("NOPD") Sex Crimes Unit testified that on January 30, 2012, he took over the victim's case, and learned that on January 26, 2012, the victim reported having been raped by approximately five unknown black males in the 1300 block of South Gayoso Street. Detective Williams identified a map of the Zion City area, a New Orleans neighborhood. He marked on the map the locations where the victim was kidnapped on Thalia Street, and where she was raped. In the course of his investigation, he was able to obtain the phone records for the victim's cellphone, which had been reported stolen during the incident. The records indicated that a call was placed from the victim's stolen cellphone to Katrina Olivier. The police went to Ms. Olivier's residence and learned the nickname of the individual who made that call, "Bizzle." "Bizzle" was ascertained to be Justin Elliott. On February 1, 2012, NOPD Officers went to Justin Elliott's residence. He agreed to go to police headquarters, where he gave a statement identifying Jermaine Rumley as the person who gave him the victim's stolen cellphone. Justin Elliott also identified the first and last names of four of the five individuals who were ultimately charged – Glenn Elliott, Jermaine Rumley, Darren Holmes, and Brian Beasley – and the first name, "David," of a fifth individual later determined to be David Quinn. Detective Williams showed Justin Elliot a single photograph containing four individual photos that Justin Elliott confirmed were of the four individuals he had fully named. Brian Beasley turned himself into the police, and the other three individuals were later apprehended together.

Detective Williams determined David Quinn's last name using the NOPD motions computer and additional information supplied by Justin Elliott as to the address of the person he only knew as "David." He obtained an updated photograph from David Quinn's school. David Quinn was taken into custody where he gave three statements denying knowledge of the crimes in the first two, and finally admitting the facts in his third statement. David Quinn stated that the two gunmen involved were Darren Holmes and Glenn Elliott, and that Darren Holmes had been the individual who first approached the victim as she sat in her vehicle. Detective Williams also testified that the faces of the perpetrators were covered during the incident and the victim was unable to identify anyone.

Detective Williams testified that he obtained search warrants on February 6, 2012, for buccal swabs (DNA samples) from Glenn Elliott and Jermaine Rumley. Justin Elliott voluntarily gave a buccal swab. Detective Williams submitted this evidence to NOPD Central Evidence and Property. This evidence and the forensic evidence collected from the victim were later transported to the Louisiana State Police Crime Lab.

Detective Williams confirmed that David Quinn identified Darren Holmes as having been armed with a weapon. David Quinn never admitted that he had a weapon or that he had engaged in sexual activity with the victim.

Justin Elliott testified that Glenn "Gunner" Elliott and Jermaine "Jerky" Rumley were his cousins and were from the Zion City neighborhood. He testified that on January 26, 2012, he was at "the studio," later determined on cross-examination to be a studio in the 4300 block of Thalia Street, where he recorded his rap music. He testified that, while in the studio, he observed Glenn Elliott and Jermaine Rumley, along with Darren Holmes, David Quinn, and Brian Beasley, leaving an abandoned house with their faces covered by white T-shirts. He had seen Darren Holmes before then, with his face uncovered. He also saw all five of them later that day with their faces uncovered.

Justin Elliott testified that later that same day, Glenn Elliott told him that Jermaine Rumley had a phone he was not using. Justin Elliott testified that Jermaine Rumley gave him the phone. Justin Elliott testified that he used the phone to call his daughter's mother, and that was how the police tracked him down. He was not in possession of the phone when Detective Williams came to his home as he had given it to Darren Holmes. He said Detective Kevin Williams showed him some photographs of Glenn Elliott, Darren Holmes, Brian Beasley, and Jermaine Rumley, which he identified in globo and signed the backs of those photos. He confirmed that he subsequently identified David Quinn's photo on February 11, 2012, at which time he also gave the police a DNA sample.

Justin Elliott testified that he was never coerced for his testimony. He testified that his testimony given at trial was the truth, and he confirmed that his testimony before the grand jury was truthful.

Joan Cooper, R.N., was qualified by stipulation as an expert in the field of sexual assault examination. Ms. Cooper testified that she was on call on January 26, 2012, and she came in to examine the victim, who had presented herself at the emergency room of University Hospital. She identified the victims's [sic] medical records from her forensic examination and treatment in connection with that visit. The victim related details of her being confronted by two men with guns at both windows of her vehicle asking for money, her subsequent kidnapping to an abandoned house, and her being raped by four to six unknown black males. She reported that the perpetrators did ejaculate but that a condom was used during the rape. She said she had consumed no medications, drugs or alcohol before or after the assaults. Ms. Cooper noted some redness in the victim's cervix, which she said was not normal. She also noted some discharge during the cervical examination. Ms. Cooper estimated that in her ten years as a sexual assault examiner, given the

elasticity of the body, she had only seen major tears or bruising in ten percent of the cases. She said the victim was post-menopausal. She noted abrasions on the victim's right arm and forearm, her left thigh, knee and shin, her left shoulder, and the lower left flank area of her waist/abdomen. Her feet had a lot of soiling. Ms. Cooper identified anatomical diagrams depicting the victim's injuries. She also identified a CD of photographs that she took of the victim during her examination, showing the victim's abrasions, bruising, and some broken toenails.

Ms. Cooper collected the victims's [sic] clothing and underwear; a fingernail swab and clippings; blood samples; oral, vaginal and anal swabs; and a miscellaneous swab. She identified a crime lab specimen collection log and described the contents of a rape kit. She stated that the collected items of evidence were placed in envelopes and sealed; placed into the kit and sealed; and then the kit was placed in a refrigerator to be secured until picked up by the appropriate law enforcement authorities. A urinalysis revealed blood in the victim's urine, which Ms. Cooper said was not normal. The victim was given Kaletra and Combivir, antiviral medications to help protect her immune system from exposure to the HIV virus; Zofran, an anti-nausea medication given because Combivir and Kaletra have a tendency to cause stomach upset; Vicodin, for pain; "Plan B" to prevent conception; and medications for sexually transmitted disease (STD) exposure.

David Quinn testified that he was seventeen years old in January 2012, and living in the uptown area of New Orleans. He knew Glenn Elliott, Jermaine Rumley, Brian Beasley, and Darren Holmes through a cousin of Glenn Elliott. He testified that on the day of the crimes, he had left school, caught the Broad Street bus, got off, and went to an apartment next door to Brian Beasley's home. There, he met those four individuals, including the two defendants. They all went to an abandoned house to smoke marijuana. He said Darren Holmes and Glenn Elliott asked him if he wanted to rob someone with them; he agreed to participate. Darren Holmes and Glenn Elliott then procured a gun. They all walked around a corner, planning to rob three "Mexicans." They went into an open location to put on masks and horse around. By the time they got around to committing the robbery, the "Mexicans" were gone. They walked around the block and saw a lady in a car. David Quinn said he and Glenn Elliott fell back, seeing no need for all five to go up to the car and rob the lady. He said Darren Holmes put the gun to the head of the lady, got into the back seat, and drove off. He and Glenn Elliott then took their masks off. The car came around a corner, and he and Glenn Elliott covered their faces. The car pulled up at the abandoned house. He identified the abandoned house as the place where they had previously smoked marijuana. David Quinn identified the location where the victim was parked at the time she was first confronted by Darren Holmes. David Quinn later identified photos of the outside and the inside of abandoned house where the rape occurred.

David Quinn testified that when the car pulled up at the abandoned house, he and Glenn Elliott put their "masks" back on and went towards the car. David Quinn testified that Jermaine Rumley appeared, and "we" (presumably meaning himself and the defendants Rumley and Elliott) searched the victim's car. They

then entered the downstairs of the abandoned house where he observed the victim performing oral sex on Darren Holmes.  He said Darren Holmes had the gun towards the victim's head.  David Quinn said he grabbed the victim's head to look at her, saw that she was older, and did not assault her.  When later asked by the prosecutor how the victim looked when he pulled her head back, David Quinn replied:  "Frightened."  David Quinn said he stepped back, and Jermaine Rumley "pursue[d] to get oral sex."  David Quinn said he walked outside, and when he came back in, Glenn Elliott was having sex with the victim from the back, while Darren Holmes was receiving oral sex from her at the same time.  David Quinn identified Darren Holmes when Darren Holmes was brought into the courtroom.

David Quinn clarified that he first saw the victim performing oral sex on Darren Holmes at gunpoint, then on Jermaine Rumley, and then on Darren Holmes as Glenn Elliott was raping the victim from behind.  David Quinn said he and Jermaine Rumley then left and went back to the other abandoned house to smoke marijuana.  He testified that Darren Holmes and Glenn Elliott showed up with "the keys, the iPod, and the phone," whereupon they went to a street running along the canal, and the keys were thrown into "the water."  David Quinn said that afterward, he and Jermaine Rumley went to Jermaine Rumley's house.  He did not know where Darren Holmes and Glenn Elliott went.

David Quinn noticed the defendants' photos in a newspaper on the morning of February 11, 2012.  He said he later saw the defendants as he walked to the bus stop, and they assured him that no one was going to say his name.  David Quinn said that a detective came to his home later that day.  He accompanied the detective to the police station, where he signed a waiver of rights and was interviewed.  David Quinn admitted he was less than entirely forthcoming in that first interview, and also in a second one, although he confirmed that he always did say that it had been an armed robbery in which they were involved.  David Quinn said that by the time he was interviewed a third time, he felt guilty and detailed the rape incident.  David Quinn confirmed that he had pleaded guilty in September of 2013 to armed robbery in exchange for a sentence of eighteen years for his involvement in the crime.  He said he wanted to get on with his life; he felt guilty for what happened; and he just wanted to tell the truth and move on.  David Quinn identified Glenn Elliott and Jermaine Rumley in open court.  He also testified that, after the assault and robbery, he saw Darren Holmes give a cell phone to Jermaine Rumley.

The victim, who was a fifty-five years old white female at the time of the rape, testified that she had not been able to return to work after the robbery and rape.  She said that on the day in question she was in her parked vehicle talking via a Bluetooth ear piece on her cell phone to "Mary," someone who sits with patients.  She was also gathering up her equipment, getting ready to go inside to visit a patient.  She sensed someone's presence and turned to see a male with a black gun.  His face was masked with a white patterned handkerchief.  The victim stopped talking to Mary, who kept calling her name.  Addressing her as "bitch," the gunman told her to give him her money.  The victim said Mary screamed in her ear over the phone, asking what was wrong.  The gunman told her to disconnect the phone, but

then grabbed it out of her lap.  He again demanded money, and she told him she had none.  He walked around the car, entered the rear seat, and began rummaging around.  He told her to pull up her shirt, and she did so, pulling out her bra and sort of shaking it to show there was no money in it.  The gunman then entered the front passenger seat of the victim's vehicle, pointed the gun at her, and told her to drive.  He directed her, addressing her as "bitch," and telling her to drive faster.  They ended up at an old run down house with a double driveway and a stairway in the middle.  She parked in one of the driveways.

The gunman then told her to get out.  One of her clogs got stuck on the brake pedal, and she left it there, too fearful to reach down and pick it up.  She said she was really scared, and the male had the gun on her the whole time.  They walked underneath the stairs and to one side of the bottom of the residence.  He told her to undress, addressing her as "bitch" and telling her to take off all of her clothes when she hesitated to remove her underwear.  He then unbuckled his pants, displayed his genitals, and demanded oral sex.  He held a gun to her head the whole time, telling her not to look at him or he would kill her.  He heard a noise, stopped, and walked away, telling her not to move or he would kill her.  He returned seconds later and forced her to resume performing oral sex on him.  Not long after that she heard footsteps, and others came from behind her, unbuckling their pants, and successively stepping in front of her as she was on her knees, forcing her perform oral sex on them.  They started talking about condoms, even asking her if she had any in her vehicle.  They began raping her vaginally and then anally.  She said she began crying out in pain during the anal penetration.

The victim said that eventually she believed her attackers had left.  She began dressing, putting on her underwear, only to have to have someone yell at her from the front of the basement:  "I didn't [tell] you you could get dressed, bitch."  She sat there for a while longer, before hearing what sounded like a car engine or car driving off.  She thought it might be safe to get up, so she put on a lab coat, walked out to the street.  Realizing where she was, she walked back to her patient's home, where she said someone telephoned the police.  She asked them not to, feeling she needed to calm down and gather her thoughts, and believing she could not make sense of it all to anyone.  She told the police she would call them back.

The victim testified that she then contacted her late son's first wife, with whom she had remained close.  That former daughter-in-law arrived, and they walked back to the victim's car.  Her ex-daughter-in-law telephoned for a tow truck, since the victim did not have her car keys.  She was driven home after her vehicle was towed away.  Her attackers had taken her driver's license and house key.  The victim said she was worried about someone going to her home and harming her children.  She wanted to go there to make sure her two sons, then twelve and sixteen years old, who would come home from school by themselves, were okay.  At home she telephoned her supervisor, who told her she had to go to a hospital.  The supervisor agreed to meet the victim at Touro Infirmary.  Touro referred the victim to University Hospital, where the victim underwent a sexual assault examination

by the "SANE" Nurse Cooper, who previously testified.  She also gave a statement there to a police officer.

The victim was asked on cross-examination about antidepressant medication being found in her vehicle after the crimes.  She said she took antidepressants after her oldest son died on November 9, 2009, while in military service.  She said that on the day of the crimes, she arrived at her patient's home between 3:30 and 4:00 p.m.  She admitted that she could not identify the person who initially confronted her with the gun, although she assisted in compiling a composite picture of him, with the bottom of his face masked.  She could not identify any of the other individuals who subsequently came to the abandoned residence.  She did not see any of their faces.  The victim replied in the affirmative when asked whether each individual sexually assaulted her, but she could not remember how many there were.  When asked whether each individual assaulted her more than once, she could not say:  "Cause I don't – I can't identify.  So I don't know."  She was asked about the voice she heard when she first began to dress herself, calling her a "bitch" and asking her who told her she could get dressed.  She could not tell whether that voice was similar to the voice of her initial assailant.  When asked about the accuracy of her report given to the "SANE" nurse at University Hospital that four to six men entered the room, she said:  "I guessed, tried to guess how many voices I was hearing.  It was all just a guesstimate.  I don't know.  Cause I did not look.  I did not turn around and look [sic] how many – how many people were in there."

Leslie Landry, a forensic DNA analyst at the Louisiana State Police Crime Lab, was qualified as an expert in the field of forensic DNA analysis.  Ms. Landry testified that DNA evidence established that Glenn Elliott could not be excluded as a minor contributor to the sperm fraction cells derived from two posterior fornix swabs (taken from the uppermost portion of the vaginal cavity) submitted under the agency case number A-36813-12.  The NOPD item number in the present case was A-036813-12 – the same number.  Ms. Landry testified that the swabs contained a DNA mixture that was consistent with being a mixture of two individuals, and that that the victim and Glenn Elliott could not be excluded as contributors of that DNA.  Ms. Landry testified that, statistically, the likelihood that the DNA mixture consisted of the DNA of the victim and Glenn Elliott versus the victim and some random person in the population was, for the Caucasian population, 1.87 trillion [to one]; for the Black population, 329 billion; and for the Southwest Hispanic population, 1.4 trillion.  Similarly, Ms. Landry testified, as to a cervical swab, that the sperm fraction was consistent with being a mixture of the DNA of the victim and Glenn Elliott.  She said that statistically, the likelihood that this DNA mixture consisted of the DNA of the victim and Glenn Elliott versus the victim and some random person in the population was, for the Caucasian population, 215 quadrillion [to one]; for the Black population, 59.7 quadrillion; and for the Southwest Hispanic population, 695 quadrillion.

Ms. Landry testified that, a third, even stronger statistical sperm fraction DNA match for Glenn Elliott (his full DNA profile) was found in an analysis of

DNA from a swab taken off of discharge found on the victim's underwear – Glenn Elliott could not be excluded as the major contributor to the DNA (Caucasian population, 7.94 sextillion; Black population, 19.6 sextillion; Southwest Hispanic population, 39.4 sextillion).

A fourth DNA sperm fraction match for Glenn Elliott was derived from a stain on the victim's scrub pants, with the same statistical probabilities as in the cases of the third sperm fraction match.  In addition, from the DNA derived from epithelial fraction from this same stain on the victim's scrub pants, Glenn Elliott could not be excluded as the minor contributor.  Finally, Ms. Landry testified that rectal swabs from the victim were positive for the presence of seminal fluid, but provided insufficient material for DNA analysis.

All six of the individuals involved, Glenn Elliott and Jermaine Rumley, Darren Holmes, Brian Beasley, David Quinn, and Justin Elliott, were excluded as contributors from the DNA profiles derived from (1) a swab taken from the victim's right fingernail; (2) a swab taken from clippings from her left hand; (3) swabs taken from the passenger door handle of her vehicle; (4) swabs taken from the front passenger seat; (5) a swab from a condom wrapper; (6) a swab taken from another condom wrapper; (7) a swab taken from one side of a condom (Ms. Landry said she could not even definitively say that the condom had the victim's DNA on it); and (8) the other side of the same condom (no victim's DNA).  Four oral swabs from the victim all tested negative for the presence of spermatozoa.

Reverend Lisa Fitzpatrick, a character witness for Glenn Elliott, testified that she is the executive director and founder of the Apex Youth Center ("Apex"), the religious community center located in the Zion City neighborhood.  She testified that Glenn Elliott had attended bible study on Sundays, which she conducted in her home, and he that he had gone to her Apex center.  She said he attended service regularly until the day he was arrested.  When asked whether she considered him to be a violent person, Reverend Fitzpatrick, replied:  "Absolutely not."  She said he was never mean or aggressive.

On cross-examination, Reverend Fitzpatrick testified that she knew his nickname was "Gunner."  She admitted that she was aware of his prior arrests in October 2011 for possession of stolen things valued at one thousand five hundred dollars or more, resisting arrest by refusing to identify himself, and distribution of legend drugs; his November 2011 arrest for illegal possession of stolen things; and his arrest in the present case.

Janifer Tropez-Martin, M.D., qualified as an expert in the field of obstetrics/gynecology, is an assistant professor of medicine at Tulane University School of Medicine, and the medical director of Louisiana Healthcare Connections. She testified that approximately sixty to seventy percent of women in menopause or perimenopause have a reduction in vaginal secretions.  She also testified that "usually" the vagina, perianal body and the anus "sort of shrinks once you're menopausal," and the vagina loses its elasticity.  She subsequently qualified that testimony, saying "not so much the anus."  She confirmed that a woman can get lacerations through normal vaginal sexual activity, but also admitted that she

actually had never performed a rape examination where there were any lacerations in the vagina or on the perineum.  However, when questioned whether it was possible for a person of non-reproductive age to "make it through" a sexual assault by five to seven people without there being any lacerations, she testified that she would expect to see "in a forced situation" some sort of evidence of that having occurred.  She testified that there could be evidence of penetration of the anus.

Dr. Tropez-Martin criticized the lack of documented detail for the sexual assault examination performed on the victim.  She said there was no sampling of pubic hair, which could mean that there was no pubic hair to sample, but it was not clearly set forth in the report.  She said there was no detail regarding the pelvic examination, and insufficient detail as to the description of the vulva and vagina. She said the notation of redness and a discharge noted in the multi-page record of the victim's medical treatment from University Hospital, really meant nothing and that it could have been a normal exam.  When asked whether that document "told her anything that that particular victim was attacked by six to eight men," Dr. Tropez-Martin replied:  "It doesn't say that it did or did not happen, no."

On cross-examination, she agreed that a woman of the victim's age could be forcibly raped and not experience vaginal injuries.  She testified that she had never conducted a rape examination of a woman as old as the victim.  She admitted that she was requested to testify by defense counsel.  She admitted that she was receiving a fee for testifying.  She confirmed on cross examination that, based on what she saw and read, she could not conclude anything insofar as the victim having been raped.

Oneka Rumley, Jermaine Rumley's mother, testified that on January 26, 2012, she left home around 3:00 p.m. to take her daughter Charmaine Rumley to work in Kenner.  When asked who her other passengers were, Ms. Rumley replied: "Roshenika Rumley, Charmaine Rumley, and Jermaine Rumley."    When subsequently asked whether it would be true to say that between 2:00 p.m. and 5:00 p.m. she was in a car with Jermaine Rumley, she replied:  "Correct."  Ms. Rumley testified that after dropping off Charmaine, she returned to her home before leaving for an appointment between 5:00 and 6:00 p.m. to view a potential residence for the family located in the Gentilly neighborhood.  When asked whether defendant Jermaine was with her when she left her home to view the Gentilly residence, she replied:  "Correct."  She replied in the affirmative when asked whether it was safe to say that between the hours of 2:00 p.m. and 7:00 p.m. the defendant Jermaine Rumley was with her.

Ms. Rumley confirmed on cross examination that on January 26, 2012, Jermaine Rumley resided with her.  She clarified that she did not pick up her daughter Charmaine from Charmaine's residence in the Falstaff Apartments until 3:00 p.m.

Ms. Rumley confirmed she never told law enforcement authorities that she had been with her son Jermaine on January 26, 2012, even after she learned of the date of the alleged rape.  She learned two or three days after January 26, 2012 that Jermaine was wanted, when law enforcement authorities came to her home looking

for him, and she said that date was the last time she saw him before he was arrested. She said law enforcement authorities came to her home approximately every other day looking for him until he was arrested on February 3, 2012. Ms. Rumley confirmed that until the prosecutor subpoenaed her to come to the district attorney's office and give a sworn statement, she had never told anyone that she had never taken her eyes off Jermaine on January 26, 2012.

      The 76 year old son of the victim's patient, testified that on the day in question he was present when a young woman came to his mother's home (presumably referring to the victim) and told his mother and his sister that she had been attacked. He thought the woman was his mother's home health care worker. He recalled that the woman was at his mother's home between 3:30 and 4:00 p.m. on the day in question. She (the victim) went out and sat on the porch for a while until some friends arrived, whereupon they all went around the corner to where the attack allegedly occurred. He said the woman's car was parked in the driveway. He said the woman seemed upset. He said neither her white pants nor her floral pattern top looked soiled. He did not think her hair seemed out of place. He was there until the tow truck arrived and the woman left with friends.

      Tina Laurent testified on rebuttal that she was the business office director for Emeritus, an assisted living center. She handled the payroll and time cards, and she was the custodian of records for the business. She testified that Charmaine Rumley had been employed at the center as a resident assistant. Ms. Laurent identified Charmaine Rumley's time card, reflecting that she came to work at 1:55 p.m. on Thursday, January 26, 2012. Ms. Laurent confirmed that Charmaine Rumley, as a resident assistant, would have had check in with a supervisor when she came into work. Ms. Laurent testified that on Friday, January 27, 2012, Charmaine Rumley clocked in at 2:11 p.m. On both days she was expected to be at work at 2:00 p.m.[14]

### IV.  Petitioner's Claims

### A.  Sufficiency of the Evidence

Petitioner's first claim is that there was insufficient evidence to support his convictions.[15]

On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

      In his sole assignment of error, Jermaine Rumley argues that the evidence is insufficient to support any of his three convictions – for aggravated kidnapping, aggravated rape, or armed robbery.
      Jermaine Rumley specifically alleges that none of the State's witnesses identified him as the one imprisoning the victim, nor forcibly seizing and carrying

---

[14] State v. Rumley, 183 So. 3d 640, 646-54 (La. App. 4th Cir. 2015); State Rec., Vol. 10 of 12.
[15] Rec. Doc. 1, p. 4.

her from one place to another. None of the State's witnesses identified him as forcing the victim to perform oral sex with a dangerous weapon/while two or more people participated. None of the State's witnesses identified him as taking something of value from the victim while he was armed with a dangerous weapon. No physical evidence places him at the scene of the crime. He specifically attacks the testimony of State witness David Quinn and additionally argues that, even accepting David Quinn's testimony, the evidence is nevertheless insufficient to support his convictions. The defendant does not argue in his sufficiency of the evidence claim that the victim was not kidnapped, raped, and arm robbed.

This Court set forth the well-settled standard of review for sufficiency of the evidence in State v. Watkins, 2013-1248, 2013-0931, pp. 13-14 (La.App. 4 Cir. 8/6/14), 146 So.3d 294, 303 (quoting State v. Huckabay, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111), as follows:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La. 1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La. 1992) at 1324.
>
> In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La. 1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198

(La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La. 1987).

The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. Watkins, 2013-1248, p. 14, 146 So.3d at 303 (citing State v. Wells, 2010-1338, p. 5 (La. 4 Cir. 3/30/11), 64 So.3d 303, 306). A factfinder's decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. Watkins, *supra*.

The due process standard of review under Jackson v. Virginia does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. State v. Higgins, 2003-1980, p. 17-18 (La. 4/1/05), 898 So.2d 1219, 1232; State v. Gordon, 2013-0495, p. 18 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 770.

When the identity of the defendant as the perpetrator is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, *supra*. State v. Galle, p. 31 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 935; State v. Everett, 2011-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619.

La. R.S. 14:42 defines aggravated rape, in pertinent part, as follows:

A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

\* \* \*

(5) When two or more offenders participated in the act.

\* \* \*

B. For purposes of Paragraph (5), "participate" shall mean:

18

(1) Commit the act of rape.

(2) Physically assist in the commission of such act.

La. R.S. 14:44 defines the offense of aggravated kidnapping, in pertinent part, as follows:

Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:

(1) The forcible seizing and carrying of any person from one place to another; or

(2) The enticing or persuading of any person to go from one place to another; or

(3) The imprisoning or forcible secreting of any person.

La. R.S. 14:64 defines armed robbery as follows:

A.  Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

La. R.S. 14:24 defines the law of principals as follows:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Justin Elliott admitted that he was a convicted felon on parole at the time he testified at trial.  Jermaine Rumley does not mention, much less attack, Justin Elliott's testimony in his sufficiency argument.  As referenced above, Justin Elliott testified that on January 26, 2012, he was in his recording studio when he observed Glenn Elliott and Jermaine Rumley, along with Darren Holmes, David Quinn, and Brian Beasley, leaving an abandoned house with their faces covered by white T-shirts.  He elaborated on cross-examination that he stepped out onto his front porch

and saw the same five individuals on South Salcedo Street with their faces uncovered.

David Quinn, like Glenn Elliott and Jermaine Rumley, had been arrested in connection with the crimes and indicted for aggravated rape, aggravated kidnapping, and armed robbery of the victim. He testified that he had pleaded guilty to the armed robbery count and received a sentence of eighteen years.

As noted above, David Quinn testified in great detail about what transpired on the day of the incident including that he witnessed both Glenn Elliott and Jermaine Rumley raping the victim. David Quinn also testified that following the incident, he and Jermaine Rumley left the scene and went back to another abandoned house, on South Salcedo Street, smoked marijuana and walked through an empty lot to get to South Salcedo Street. He testified that Darren Holmes and Glenn Elliott had the victim's "keys, the iPod, and the phone" which they threw into a canal with the exception of the cell phone. David Quinn testified that he saw Darren Holmes give a cell phone to Jermaine Rumley.

David Quinn's testimony was supported by the testimony of the reluctant witness Justin Elliott, a cousin of both defendants. David Quinn's testimony was also supported by physical evidence, including the multiple matches of Glenn Elliott's DNA to DNA derived from swabs taken from the victim during her sexual assault examination on the evening of the crimes and from stains on her underwear and scrub pants.

The victim's testimony was entirely consistent with David Quinn's testimony describing the entire ordeal involving her rape, sexual assault and robbery. It is not disputed that the victim's car was towed from the scene, supporting both her testimony that her keys were stolen and David Quinn's testimony that after the attack Darren Holmes and Glenn Elliott, had thrown the keys into a canal.

The victim's testimony was also supported to a degree by defense witnesses Glenn Dabney and Romalice Anderson, two residents of the Zion City neighborhood, who both observed her in the aftermath of the crimes.

Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Jermaine Rumley (1) orally raped the victim, where the victim was prevented from resisting the act by (a) threats of great and immediate bodily harm accompanied by apparent power of execution from another principal to the act, and/or (b) because another principal to the act was armed with a dangerous weapon, and/or (c) under circumstances where two or more offenders participated in the act (aggravated rape); (2) was a principal to the victim's forced imprisonment in the basement at gunpoint where he and others sexually assaulted her, with her submitting in order to survive and ultimately be released;[FN 3] and (3) was a principal to the taking of the victim's property by force or intimidation while another principal was armed with a gun (armed robbery) – Jermaine Rumley actually ended up in possession of the victim's cell phone, and her armed robbery had been the initial object of the group.

[FN 3]  See State v. Leger, 2005-0011, p. 98 (La.7/10/06), 936 So.2d 108, 173 (quoting State v. Arnold, 548 So.2d 920 (La. 1989)), ("[T]he question and the issue to be focused upon is whether the defendant sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim's fear and hope of eventual release in order to gain compliance with his demands.")[.]

There is no merit to Jermaine Rumley's sole assignment of error.[16]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[17]

Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017). For the following reasons, the Court finds that he has made no such showing.

In this case, the state courts correctly identified the controlling federal law concerning such claims: Jackson v. Virginia, 443 U.S. 307 (1979). Under Jackson, the question before a court is not "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (citation and quotation marks omitted). In other words, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"

---

[16] State v. Rumley, 183 So. 3d 640, 655-58 (La. App. 4th Cir. 2015); State Rec., Vol. 10 of 12.
[17] State v. Rumley, 215 So. 3d 241 (La. 2017); State Rec., Vol. 12 of 12.

Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (emphasis added) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

In addition, Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 566 U.S. at 655 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Lastly, because the Jackson standard is itself deferential, and because the AEDPA's standards of review are also deferential, a federal habeas court's review of a sufficiency of the evidence claim is in fact "twice-deferential."  Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012).  Further, under the AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the

state court decision was objectively unreasonable." <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (quotation marks omitted). As a result, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." <u>Id.</u>

Mindful of these principles, the Court finds that petitioner's claim must be rejected for the following reasons.

Petitioner does not appear to dispute that an aggravated rape, aggravated kidnapping, and armed robbery actually occurred in this case or that all of the elements of those crimes were established at trial. Rather, he appears merely to argue that the state failed to prove that *he* was one of the perpetrators.

However, it must be noted that petitioner's presence at the scene of the crime was established through the testimony of both Justin Elliot (petitioner's cousin, who saw petitioner leaving the crime scene with his face covered with a white t-shirt) and David Quinn (one of the other perpetrators). Quinn's testimony additionally established that petitioner was in fact an active participant in the aggravated rape and a principal to the aggravated kidnapping and armed robbery. That testimony alone sufficed to support petitioner's convictions, because the testimony of a single eyewitness, if found credible by the trier of fact, is sufficient to prove identity and support a conviction. <u>United States v. King</u>, 703 F.2d 119, 125 (5th Cir. 1983); <u>accord</u> <u>Davis v. Cain</u>, Civ. Action No. 15-6652, 2016 WL 4537915, at *7 (E.D. La. May 24, 2016), <u>adopted</u>, 2016 WL 4529877 (E.D. La. Aug. 30, 2016); <u>Colbert v. Cain</u>, Civ. Action No. 14-2472, 2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016), <u>adopted</u>, 2016 WL 4161257 (E.D. La. Aug. 5, 2016); <u>Phillips v.</u>

Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012).

Moreover, to the extent that petitioner is challenging the credibility of one or both of those witnesses, it must be remembered that credibility determinations are the province of the jurors. Therefore, a federal habeas court generally will not grant relief on a sufficiency claim grounded on such issues of credibility.   See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips, 2012 WL 2564926, at *14; Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

To summarize:  when the evidence in the instant case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdicts were *irrational*.  Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, petitioner's claim should be denied.

## B.  Severance

Petitioner next claims that the trial court abused its discretion in denying his motion for severance.[18]  In the post-conviction proceedings, the state district court denied that claim, holding:

> In Petitioner's application, he argues that this Court abused its discretion in denying the petitioner's motion to sever.  The Court has considered and reviewed

---

[18] Rec. Doc. 1, p. 7; Rec. Doc. 1-2, pp. 10 and 12-17.

Petitioner's claim and finds it to be without merit. A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. <u>State v. Prudholm</u>, 446 So.2d 729 (La. 1984). The defendant bears the burden of proof in a motion to sever; mere unsupported allegations that defenses will be antagonistic are not sufficient to require severance. <u>Id.</u> Here, petitioner failed to demonstrate any mutual antagonism between him and his co-defendant's defense within his pretrial motion to sever. Further, Petitioner failed to demonstrate that his co-defendant would, in fact, testify at a separate trial or that his co-defendant's testimony would exculpate him. Thus, this Court does not find that it abused its discretion in denying the petitioner's pre-trial motion to sever.[19]

The Louisiana Fourth Circuit Court of Appeal thereafter denied relief without assigning reasons,[20] and the Louisiana Supreme Court then likewise denied relief stating simply that "relator fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[21]

This Court need not – and does not – consider whether the motion to sever should have been granted under *Louisiana law*. Even if state law required severance, that would be immaterial in this federal habeas corpus proceeding. <u>See, e.g.</u>, <u>Holmes v. Cain</u>, Civ. Action No. 15-5943, 2017 WL 6452415, at *18 (E.D. La. May 22, 2017) ("To the extent that petitioner is arguing that the state court erred in applying state law in denying his motion for severance, his claim simply is not cognizable in this federal proceeding."), <u>adopted</u>, 2017 WL 6415467 (E.D. La. Dec. 15, 2017). Simply put: "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). Rather, a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody *in*

---

[19] State Rec., Vol. 1 of 12, Judgment dated June 20, 2017, p. 1.
[20] <u>State v. Rumley</u>, No. 2017-K-0797 (La. App. 4th Cir. Oct. 16, 2017); State Rec., Vol. 11 of 12.
[21] <u>State *ex rel.* Rumley v. State</u>, 259 So. 3d 335 (La. 2018); State Rec., Vol. 12 of 12.

*violation of the Constitution or laws or treaties of the United States.*" 28 U.S.C. § 2254(a) (emphasis added); see also McGuire, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Further, to the extent that petitioner is arguing that the denial of the severance motion violated his rights under *federal* law, his claim does not warrant federal habeas corpus relief.  As noted, where, as here, the state courts have denied his claim on the merits, a petitioner must show that the decision denying his claim "was contrary to, or involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States.*"  28 U.S.C. § 2254(d)(1) (emphasis added).  That dooms petitioner's claim, because "[t]here is no clearly established federal law *set forth by the Supreme Court* holding that co-defendants have a right under the Due Process Clause not to be joined for trial, even for defendants with antagonistic defenses."  Duckett v. Vannoy, Civ. Action No. 16-6823, 2017 WL 6001729, at *11 (E.D. La. June 7, 2017) (emphasis added), adopted, 2017 WL 5992077 (E.D. La. Dec. 4, 2017).  On the contrary, the United States Supreme Court has observed that there is generally "a preference … for joint trials of defendants who are indicted together," opining, "[j]oint trials play a vital role in the criminal justice system.  They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.  For these reasons, we repeatedly have approved of joint trials."  Zafiro v. United States, 506 U.S. 534, 537 (1993) (citations and quotation marks omitted).  The Supreme Court also expressly noted that "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  Id. at 540.  In addition, even where there may be some potential risk of prejudice in a joint trial, it

is normally "of the type that can be cured with proper instructions, and juries are presumed to follow their instructions." Id. (quotation marks omitted).

Accordingly, because petitioner cannot establish that the state court's decision denying this claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, the AEDPA requires that this federal court defer to that state court ruling and likewise deny relief.

## C. Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel.[22]  In the post-conviction proceedings, the state district court denied that claim, holding:

> Petitioner contends that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.  Specifically, Petitioner argues that counsel failed to petition the trial court for his immediate release for lack of evidence and failed to investigate his case and present a defense that challenged the State's case against him.  In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result".  Id. at 699.  In particular, the defendant must show that his representation fell below an objective standard of reasonableness *and* that but for counsel's errors, the result(s) of the trial would have been different.  Id. Further, it is unnecessary to address the issues of both counsel's performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components.  State v. Serigny, 610 So.2d 857, 859-60 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1263 (La. 1993).
>
> Here, petitioner's allegations are general and conclusory in nature and is insufficient to support a claim that he was prejudiced by any conduct by his counsel. State v. Camp, 46,052 (La.App. 2 Cir. 3/16/11), 59 So.3d 548, writ denied, 11-954 (La. 12/16/11), 76 So.3d 1199.  Further, Petitioner fails to show that counsel's representation fell below an objective standard of reasonableness.  Petitioner fails to point to any evidence that would substantiate any of his claims and fails to allege with specificity what the investigation would have revealed and how it would have altered the outcome of a trial or sentencing.  See State v. Castaneda, 94-1118, p. 14 (La. App. 1 Cir. 6/23/95), 658 So.2d 297, 306.  Petitioner's general statements and

---

[22] Rec. Doc. 1, pp. 7-8; Rec. Doc. 1-2, pp. 18-20.

conclusory charges will not suffice. Accordingly, Petitioner's ineffective assistance of counsel claims are without merit.[23]

The Louisiana Fourth Circuit Court of Appeal thereafter denied relief without assigning reasons,[24] and the Louisiana Supreme Court then likewise denied relief stating simply that "[r]elator fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[25]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting such a claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The

---

[23] State Rec., Vol. 1 of 12, Judgment dated June 20, 2017, pp. 1-2.

[24] <u>State v. Rumley</u>, No. 2017-K-0797 (La. App. 4th Cir. Oct. 16, 2017); State Rec., Vol. 11 of 12.

[25] <u>State *ex rel.* Rumley v. State</u>, 259 So. 3d 335 (La. 2018); State Rec., Vol. 12 of 12.

> more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then

explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted). Therefore, on a habeas review of an ineffective

assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation

marks omitted). For the following reasons, the Court finds that, under those stringently deferential

standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective

assistance of counsel claims.

As the state courts correctly held, the clearly established federal law with respect to such ineffective assistance of counsel claims was set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). For relief to be granted on such claims, Strickland requires that a petitioner show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the Strickland test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the

relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

In the instant case, petitioner first opines that his counsel was "inexperienced and lacked the skill necessary to represent clients in a case of this magnitude."[26]  However, even putting aside the fact that petitioner has presented no evidence whatsoever regarding his counsel's level of experience (or lack thereof), the Court notes that counsel cannot be deemed ineffective merely because he lacked experience.  On the contrary, as the United States Supreme Court has observed: "Every experienced criminal defense attorney once tried his first criminal case. ...  The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation."  United States v. Cronic, 466 U.S. 648, 665 (1984); accord Yohey v. Collins, 985 F.2d 222, 228 (5th Cir. 1993) ("[A]n attorney can render effective assistance of counsel even if he has had little prior experience in criminal cases."); Johnson v. Cain, Civ. Action No. 08-4208, 2009 WL 2366385, at *5 (E.D. La. July 29, 2009) ("The mere fact that a licensed attorney lacks criminal law experience is not alone sufficient to support an ineffective assistance of counsel claim."); Bell v. Epps, Civ. Action No. 3:04CV212, 2008 WL 2690311, at *10 (N.D. Miss. June 20, 2008) ("The Sixth Amendment does not require seasoned counsel, it requires effective counsel."), aff'd, 347 F. App'x 73 (5th Cir. 2009); United States v. Ferneau, Nos. l:03-cr-046 and l:06-cv-070, 2007 WL 430208, at *3 (D.N.D. Feb. 2, 2007) ("It is well-established that simply claiming counsel was inexperienced is insufficient to show ineffective assistance."); United States v. Brady, No. 4:05-cr-023, 2006 WL 3498558, at *3 (D.N.D. Dec. 1, 2006).

---

[26] Rec. Doc. 1-2, p. 19.

Petitioner additionally claims that due to counsel's "limited trial experience [he] couldn't even give intelligent reasons for why he objected most of the time which prevented Mr. Rumley from being able to preserve the many errors made by the Trial Court and State."[27]   However, petitioner identified neither any examples of such conduct in the trial record nor any nonfrivolous errors which were not preserved for appeal as a result of such bungled objections.  Where, as here, a petitioner contends that counsel failed to properly preserve errors for appellate review, but the petitioner then fails to "set forth the nature of *any* of the errors trial counsel purportedly failed to preserve" and does "not assert any resulting prejudice," his claims are deemed "conclusory." Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000).  Relief is therefore unwarranted, because "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding."  Id.; accord United States v. Holmes, 406 F.3d 337, 361 (5th Cir. 2005) ("To succeed on [an] ineffective assistance claim, [a petitioner] bears the burden of demonstrating that counsel's performance was deficient and that the deficient performance prejudiced his defense.   [A petitioner] cannot escape this burden merely by stating his conclusion.").

Petitioner also claims that his counsel was ineffective for failing to petition the court for his pretrial release.[28]   However, even if the Court assumes for the purposes of this opinion that there was an adequate legal basis for seeking such pretrial release, petitioner has not shown that he suffered the required prejudice resulting from counsel's performance in seeking (or failing to seek) his release from pretrial detention.  As noted, to establish "prejudice" under Strickland, a

---

[27] Id.
[28] Id.

petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the *result of the proceeding would have been different*."    Strickland, 466 U.S. at 694. Where, as here, a petitioner fails to show that his pretrial detention affected his *trial's ultimate outcome*, he has not stated a cognizable ineffective assistance of counsel claim.    See, e.g., United States v. Burns, 990 F.2d 1426, 1437 (4th Cir. 1993) ("That [defendant] was imprisoned temporarily before trial does not prove that the trial itself was unfair; … whether the lawyer's unprofessional dereliction contributed to the delay in [defendant's] release has no bearing upon the lawyer's performance in defending him on the merits."); United States v. Weaver, 882 F.2d 1128, 1139 (7th Cir. 1989) ("[Defendant] does not specify how his release would have changed the result of his trial.  While lack of diligence in obtaining a criminal defendant's pretrial release cannot be condoned, reversal of a conviction is not the appropriate remedy where the trial itself was not affected by the default." (quotation marks omitted)); Schwertz v. Cain, Civ. Action Nos. 12-1897 and 12-2142, 2012 WL 5956308, at *13 (E.D. La. Nov. 13, 2012) ("Petitioner … claims that counsel failed to move to have petitioner released on bail.  However, … this Court is concerned only with errors which undermine confidence in the *outcome of the trial*, and petitioner fails to explain how there is a reasonable probability that the ultimate result of this proceeding would have been different if counsel had moved for bail.  Therefore, … petitioner has not established the prejudice required to support his claim."), adopted, 2012 WL 5949516 (E.D. La. Nov. 28, 2012); Ballard v. Cain, Civ. Action No. 05-3691, 2006 WL 980674, at *3 (E.D. La. Apr. 12, 2006) ("Petitioner's … argument is that his counsel was ineffective in failing to file a motion for bond reduction …. [T]he Court does not find that the Petitioner was prejudiced such that the outcome

33

of the *trial* would have been different had his counsel filed a motion to reduce the amount of Petitioner's bail.").

Petitioner next claims that his counsel was ineffective for failing to perform an adequate pretrial investigation into the facts of the case.[29] However, the Court initially notes that petitioner has never offered any evidence whatsoever as to what steps counsel took or failed to take in investigating the case. Without such evidence, he cannot show that counsel performed deficiently in that respect. Netter v. Cain, Civ. Action No. 15-584, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), adopted, 2016 WL 7116070 (E.D. La. Dec. 7, 2016).

Moreover, in any event, even if petitioner had made that showing, he would then additionally have to prove that prejudice resulted from the inadequate investigation. To make that showing, he must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information beneficial to the defense. See Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008). Because petitioner has not identified any beneficial evidence that could have been discovered in a more thorough investigation, his claim is wholly speculative and, therefore, necessarily fails. See, e.g., Perry v. Louisiana, Civ. Action No. 19-13002, 2020 WL 1892794, at *19 (E.D. La. Mar. 30, 2020), adopted, 2020 WL 1889188 (E.D. La. Apr. 16, 2020); Eaglin v. Louisiana, Civ. Action No. 19-9659, 2020 WL 475770, at *25 (E.D. La. Jan. 7, 2020), adopted, 2020 WL 474923 (E.D. La. Jan. 20, 2020).

---

[29] Id. at p. 20.

Petitioner similarly claims that his counsel was ineffective for failing to conduct adequate pretrial discovery.[30] However, because petitioner likewise does not identify any beneficial evidence that would have been revealed through more thorough pretrial discovery, that claim also necessarily fails. See, e.g., Kron v. Tanner, Civ. Action No. 09-7572, 2010 WL 3488227, at *11 n.26 (E.D. La. May 4, 2010), adopted, 2010 WL 3470465 (E.D. La. Aug. 30, 2010); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *8 (E.D. La. Mar. 20, 2008).

Petitioner next faults counsel for purportedly failing to "present a defense."[31] However, petitioner identifies no potentially viable defense which counsel eschewed. Sometimes, as is evidently the case here, counsel's only option is to vigorously test the state's case and argue to the jury that the state has failed to carry its burden of proving that the accused is guilty beyond a reasonable doubt. Simply because counsel was unable to fashion a nonexistent defense out of whole cloth does not mean that he performed deficiently or that prejudice resulted. See, e.g., Robinson v. Cooper, Civ. Action No. 12-1327, 2013 WL 2154011, at *10 (E.D. La. May 21, 2013); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *9 (E.D. La. Mar. 20, 2008).

The Court is aware that petitioner additionally argues that even if his separate contentions regarding counsel's ineffectiveness do not warrant relief when considered individually, relief is warranted when they are considered cumulatively.[32] However, he is incorrect on that point. As an initial matter, the Court notes that "[t]he [United States] Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims." Hill v. Davis, 781 F. App'x 277, 280-81 (5th Cir. 2019), cert. denied, 140 S. Ct. 389 (2019); accord Chester v.

---

[30] Id.
[31] Id.
[32] Id. at p. 19.

Vannoy, Civ. Action No. 16-17754, 2018 WL 2970912, at *52 (E.D. La. June 11, 2018) ("Although the U.S. Supreme Court's use of the plural 'errors' in the prejudice context suggests Strickland's prejudice prong should be evaluated cumulatively, this Court cannot say such a requirement is clearly established by U.S. Supreme Court precedent.").  In any event, where, as here, a petitioner has failed to prove that his counsel was ineffective in *any* respect, "there is nothing to cumulate."  Villaneuva v. Stephens, 555 F. App'x 300, 308 (5th Cir. 2014); accord United States v. Thomas, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in Strickland."); Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008) ("[T]he district court noted that '[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised'. We agree."); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000) ("[Petitioner] has not demonstrated error by trial counsel; thus, by definition, [petitioner] has not demonstrated that cumulative error of counsel deprived him of a fair trial.").  As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error:  "Twenty times zero equals zero."  Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

Lastly, it is unclear whether petitioner is also asserting a freestanding claim that he was denied the effective assistance of counsel in the state post-conviction proceedings.  However, if he is, that claim also fails.  The United States Supreme Court has stated:  "We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their

convictions …. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further." Pennsylvania v. Finley, 481 U.S. 551, 555 (1987).

That said, the Court is aware that petitioner's application repeatedly cites Martinez v. Ryan, 566 U.S. 1 (2012).[33] However, in Martinez, the United States Supreme Court merely held that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a *procedural default* will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." Id. at 17 (emphasis added). However, because this Court has not rejected any of petitioner's claims as *procedurally defaulted*, Martinez is inapplicable.

Further, if petitioner is perhaps contending that Martinez implicitly *mandated* states to provide counsel to petitioner on collateral review, he is incorrect. See *In re* Sepulvado, 707 F.3d 550, 554 (5th Cir. 2013) ("To the extent that Sepulvado relies on a supposed constitutional right to the effective assistance of post-conviction counsel, he misapprehends the holding and import of Martinez, which did not alter our rule that the Sixth Amendment does not apply in habeas proceedings." (quotation marks omitted)). See also 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

For all of the foregoing reasons, the Court finds that petitioner's ineffective assistance of counsel claims have no merit and should be denied.

---

[33] See, e.g., id. at pp. 6-12.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** the federal application for habeas corpus relief filed by Jermaine Rumley be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[34]

New Orleans, Louisiana, this ___29th___ day of May, 2020.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[34] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.